UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ROBERT HIE,

        Plaintiff,

      v.                               Civil Action 2:20-cv-2660
                                              Magistrate Judge Chelsey M. Vascura

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

## OPINION AND ORDER

Plaintiff, Robert Hie ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). The parties have consented to jurisdiction pursuant to 28 U.S.C. § 636(c). (ECF No. 6.) This matter is before the Court on Plaintiff's Statement of Errors (ECF No. 17), the Commissioner's Response in Opposition (ECF No. 18), and the administrative record (ECF No. 14). For the reasons that follow, Plaintiff's Statement of Errors is **OVERRULED** and the Commissioner's decision is **AFFIRMED**.

## I.      BACKGROUND

This is not Plaintiff's first SSI application. Plaintiff previously filed applications for SSI and disability insurance benefits ("DIB") on April 20, 2009, alleging that he became disabled on November 15, 2007. (R. at 85, 485.) It appears that those applications were denied initially and upon reconsideration; a hearing was held in January 2011; and an unfavorable determination was issued by Administrative Law Judge Faust ("ALJ Faust") on March 16, 2011. (R. at 82–98.) The Appeals Council denied Plaintiff's request for review of that March 16, 2011 determination,

and thus, it became final.  (R. at 99–104.)  It does not appear that Plaintiff sought judicial review of that final determination.

Plaintiff protectively filed a second application for SSI on March 13, 2012, alleging that he became disabled on December 15, 2008.  (R. at 205.)  Plaintiff's second application was denied initially on June 14, 2012, and upon reconsideration on October 9, 2012.  (R. at 105–20, 122–36.)  Administrative Law Judge Gregory Hamel ("ALJ Hamel") held a hearing on May 28, 2013 (R. at 52–80), and issued an unfavorable determination on July 5, 2013 (R. at 33–51).  The Appeals Council denied Plaintiff's request for review, and Plaintiff sought judicial review in this Court.  (R. at 1–7.)

While that federal action was pending, Plaintiff filed a third SSI application on January 9, 2016, which was denied initially in April 2016, and on reconsideration in June 2016.  (R. at 612–30, 631–50.)  And while Plaintiff's third application was being administratively determined, this Court remanded the federal action involving Plaintiff's second application on July 22, 2016, because ALJ Hamel had failed to sufficiently explain why he discounted certain opinion evidence.  (*Id.* at 592–604.)  Based on that remand order, the Appeals Council sent the case dealing with Plaintiff's second application to another administrative law judge, Jeanine Lesperance ("ALJ Lespernce"), on October 18, 2016, and it was consolidated with Plaintiff's third application.  (R. at 605–09.)

ALJ Lesperance held a hearing on February 9, 2017, and issued an unfavorable determination on Plaintiff's consolidated applications on March 29, 2017.  (R. at 512–44, 651–77.)  The Appeals Council, however, vacated ALJ Lesperance's March 29, 2017, determination and remanded it back to her.  (R. at 678–83.)  After the Appeals Council's remand, ALJ Lesperance held another hearing on February 26, 2019, at which Plaintiff, represented by

2

counsel, appeared and testified. (R. at 545–65.) Vocational expert Charlotta Ewers (the "VE")

also appeared and testified. (*Id*.) On March 26, 2019, ALJ Lesperance issued a determination

finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 482–

511.) On May 8, 2020, the Appeals Council denied Plaintiff's request for review and adopted

ALJ Lesperance's May 8, 2020 determination as the Commissioner's final decision. (R. at 475–

81.) Plaintiff timely commenced the instant action. (ECF No. 1.)

Plaintiff asserts that the following two errors require remand: (1) ALJ Lesperance failed

to include limitations in Plaintiff's residual functional capacity ("RFC")[1] stemming from medical

conditions that she had determined were severe; and (2) ALJ Lesperance failed to properly

consider and weigh opinions from two consultative examiners. The Court finds that these

allegations of error lack merit.

## II.      ALJ LESPERANCE'S DECISION

On March 26, 2019, ALJ Lesperance issued her determination finding that Plaintiff was

not disabled within the meaning of the Social Security Act. (R. at 482–511.) At step one of the

---

[1] A claimant's RFC represents the most that a claimant can do despite his or her limitations. 20 U.S.C. § 404.1545(a)(1).

sequential evaluation process,[2] ALJ Lesperance found that Plaintiff had not engaged in

substantially gainful activity since Plaintiff's March 5, 2012 application date. (R. at 487–88.) At

step two, ALJ Lesperance found that Plaintiff had the following severe impairments:

degenerative joint disease of the left hip, status post total hip replacement; right hip arthritis;

degenerative joint and disc disease of the thoracis and lumbar spine; obesity; borderline

intellectual functioning; anti-social personality disorder; and depressive disorder. (R. at 488.) At

step three, the ALJ found that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled one of the listed impairments described in 20 C.F.R.

Part 404, Subpart P, Appendix 1. (R. at 489–91.) Before proceeding to step four, ALJ

Lesperance set forth Plaintiff's RFC as follows:

> [T]he claimant has the residual functional capacity to: perform a range of work
> between sedentary and light such that the claimant can lift and carry 20 pounds
> occasionally, and 10 pounds frequently; sit for a total of 8 hours in an 8-hour
> workday and no longer than 2 hours at a time with normal breaks; stand and walk
> for a total of 2 hours in an 8-hour workday; push and pull within these limitations
> but not with the left leg [;] occasionally balance, stoop, crouch, kneel, or crawl [;]

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive
finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th
Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.   Is the claimant engaged in substantial gainful activity?
2.   Does the claimant suffer from one or more severe impairments?
3.   Do the claimant's severe impairments, alone or in combination, meet or equal the
     criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20
     C.F.R. Subpart P, Appendix 1?
4.   Considering the claimant's residual functional capacity, can the claimant perform his
     or her past relevant work?
5.   Considering the claimant's age, education, past work experience, and residual
     functional capacity, can the claimant perform other work available in the national
     economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

and avoid exposure to hazards such as dangerous machinery and unprotected heights.  In addition, the claimant is limited to simple, routine tasks.

(R. at 491–92.)  When assessing this RFC, ALJ Lesperance indicated that because there had been a final determination on Plaintiff's first application (i.e., the determination issued by ALJ Faust on March 16, 2011), she would generally adopt the findings in that determination given that there was no new material evidence or changed circumstances.  (R. at 492.)[3]

ALJ Lesperance then relied on testimony from the VE to conclude at steps four and five that Plaintiff was unable to perform his past relevant work but that he was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.  (R. at 500–02.)  ALJ Lesperance therefore concluded that Plaintiff was not disabled under the Social Security Act since March 5, 2012.  (R. at 502.)

### III.    RELEVANT RECORD EVIDENCE[4]

**A.    Plaintiff's Testimony**

Plaintiff testified to all the following facts about his mental limitations at the February 9, 2017 hearing.  He attended school until the sixth grade when "they started skipping [him] up" to the ninth grade at which point he dropped out.  (R. at 520.)  He attempted to take a practice test for the GED, but he could not pass it.  (R. at 520–21.)  Plaintiff indicated that his hip prevented him from being able to work and that his need to get up and stretch and his lack of education prevented him from doing "sit-down" work.  (R. at 525–26.)

---

[3] The principles of *res judicata* provide that, in the absence of new and material evidence or changed circumstances, a subsequent ALJ is bound by the findings of a previous ALJ or Appeals Council decision.  *See* Social Security Acquiescence Rulings 98-3(6), 98-4(6); *Dennard v. Sec'y of Health and Hum. Servs.*, 907 F.2d 598 (6th Cir. 1990); *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), as modified by *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018).  The parties do not challenge the ALJ's application of *res judicata.*

[4] Because Plaintiff's allegations of error pertain only to his mental limitations, the Court's discussion and analysis is limited to the same.

Plaintiff also testified to the following on February 9, 2017.  Plaintiff's doctor, Dr. Antonio Phillips, stopped treating Plaintiff after he was unable to produce urine for a drug screen in 2014.  (R. at 530–31.)  Since then, Plaintiff had not received treatment or medication for his psychiatric condition.  (*Id*.)  Plaintiff's psychological condition was the same since he had stopped taking medication.  (R. at 532.)  He still got depressed and would "holler" about not being able to work.  (*Id*.)  He indicated that it was lonely not being able to do anything.  (*Id*.)  Plaintiff saw friends socially every six months to a year.  (*Id*.)  He had also used marijuana to try and ease his physical pain.  (*Id*.)  He had difficulty sleeping through the night and would nap during the day.  (R. at 536–37.)

At the hearing on February 26, 2019, Plaintiff testified that he had sought treatment for his hip pain since the 2017 hearing.  (R. at 552.)  He further testified that there were no other health problems that had come up in the past two years.  (R. at 555.)

## B.    Treatment Records

On July 28, 2010, Plaintiff was evaluated by Dr. Earl Bartley for hip pain.  (R. at 376.) Dr. Bartley wrote that Plaintiff liked reading.  (*Id*.)

On August 9, 2010, Plaintiff sought treatment for hip pain.  (R. at 341.)  He denied psychiatric symptoms.  (*Id*.)  Upon examination, he had appropriate mood and affect.  (R. at 344.)

An April 5, 2011 handwritten treatment note simply states "depression."  (R. at 389.)

Plaintiff sought treatment for back pain and dental problems at the ER on January 24, 2012.  (R. at 394.)  Examination notes state that Plaintiff had a normal psychiatric evaluation with normal interpersonal interactions and appropriate affect and demeanor.  (R. at 396.)

Plaintiff presented with hip pain and depression to Dr. Antonio Phillips on April 19, 2012.  (R. at 442.)  Plaintiff reported that his depression had started about one year prior and that

6

it made it somewhat difficult to meet home, work, or social obligations.  (*Id*.)  There were no relieving factors.  (*Id*.)  He experienced anxious, fearful thoughts, depressed mood, fatigue, and loss of energy.  (*Id*.)  But he denied suicidal or homicidal ideation.  (*Id*.)  Upon examination, Plaintiff was alert and oriented and he had no unusual anxiety or evidence of depression.  (R. at 444.)  Plaintiff was prescribed paxil and the importance of counseling was discussed.  (*Id*.)

Dr. Phillip's May 10, 2012 treatment notes indicate that Plaintiff reported that his medication made him sick to his stomach.  (R. at 438.)  Plaintiff was alert and oriented and he had no unusual anxiety or evidence of depression.  (R. at 439.)  Plaintiff's paxil was discontinued and he was prescribed abilify.  (R. at 440.)  Counseling options were also discussed.  (*Id*.)

During Dr. Phillips' examinations on May 17, May 24, June 7, and August 7, 2012, Plaintiff was alert and oriented and he had no unusual anxiety or evidence of depression.  (R. at 436, 432, 429, 426.)  On May 24, 2012, Plaintiff reported to Dr. Phillips that abilify had been helpful.  (R. at 431.)  On June 7, 2012, Dr. Phillips wrote "will continue abilify, helpful."  (R. at 429.)  On August 7, 2012, Dr. Phillips wrote that Plaintiff's depression was "stable on abilify, discussed the importance of counseling."  (R. at 426.)

During Dr. Phillips's examinations on February 13, March 21, May 13, August 22, and November 13, 2013, Plaintiff was alert and oriented and he had no unusual anxiety or evidence of depression.  (R. at 467, 470, 913, 29, 16.)  On March 21, 2013, Dr. Phillips wrote "depression" "will continue abilify, discussed the importance of counseling."  (R. at 470.)  On March 21 and May 13, 2013, Dr. Phillips also wrote "affective psychosis" "improved on abilify." (R. at 470, 914.)  On August 13, 2013, Dr. Phillips wrote that Plaintiff's affective psychosis was "stable on abilify."  (R. at 25.)  On November 13, 2013, however, Dr. Phillips wrote that abilify was discontinued because of insurance and Plaintiff was prescribed risperidone.  (R. at 17.)

Plaintiff sought treatment from Dr. Phillips on February 13, March 13, May 13, August 4, September 16, and November 4, 2014.  (R. at 18, 942, 945, 948, 951, 957.)  During examinations at those visits, Plaintiff was alert and oriented and had no unusual anxiety or evidence of depression.  (R. at 20, 944, 946, 949, 953, 958.)  On February 13, 2014, Dr. Phillips wrote that Plaintiff's depression was "stable on meds."  (R. at 16.)  On May 13, 2014, Dr. Phillips wrote that he would increase Plaintiff's risperidone dosage.  (R. at 946.)

Plaintiff was referred to Ohio Health for a consultation on May 20, 2014.  (R. at 954.)  Upon examination, he was awake, alert, and oriented, and no depression or anxiety were found.  (R. at 955.)

Plaintiff treated with Dr. Phillips again on February 4, 2015.  (R. at 960.)  Upon examination, Plaintiff was alert and oriented and had no unusual anxiety or evidence of depression.  (R. at 961.)

During an ER visit on November 12, 2016, Plaintiff was alert and oriented to person, place, and time.  (R. at 990.)

At an appointment with a nurse practitioner on January 17, 2019, Plaintiff was negative for acute mood changes, suicidal ideation, and homicidal ideation.  (R. at 1018.)  He was also alert and oriented and had a normal affect. (R. at 1020.)

## C.    Consultative Examiners

Plaintiff was consultatively examined by Lari Meyer, PhD., in May 2012.  (R. at 413–24.)  Dr. Meyer opined that Plaintiff "would be able to understand, remember, and follow simple instructions in order to complete a basic work task, but would demonstrate difficulty with more complex instructions due to borderline intellectual functioning."  (R. at 423.)  Dr. Meyer also opined that Plaintiff "would be able to maintain attention and concentration to complete a basic work task in an environment with increased supervision."  (R. at 423–24.)  Dr. Myer further

opined that Plaintiff would be able to relate to others over a short period of time; however, if required to relate to others over a sustained period of time, he would demonstrate verbal angry outbursts, based on self-report." (R. at 424.)  In addition, Dr. Myer opined that Plaintiff "would be able to complete simple, rote, and repetitive work tasks in low stress work situations.  As stressful work situations arise, he would demonstrate verbal anger outbursts, based on his self-report." (*Id*.)  Dr. Myer noted, however, that Plaintiff "put forth reduced effort, and [did] provide bizarre responses at times, and so results should be interpreted cautiously and are likely invalid." (R. at 422.)  Dr. Myer also wrote: "Self-report information should be used and interpreted somewhat cautiously.  There are some discrepancies with reported history today versus a previous examination completed in 2009, including description of psychological and psychiatric symptomology." (R. at 421.)

John Tilley, Psy. D., conducted a consultative examination in March 2016.  (R. at 977–87.)  Dr. Tilley opined that Plaintiff could remember and carry out simple instructions, but that he would likely have difficulty remembering complex instructions.  (R. at 985.)  He further opined that although Plaintiff's "attention and concentration are intact at a basic level, he would likely evidence substantial problems evidencing persistent cognitive efforts in work-related activity as a result of his intellectual problems and depression." (*Id.*)  Dr. Tilley observed that Plaintiff was "appropriately behaved and interpersonally appropriate" during the evaluation and opined that he would not expect Plaintiff to have substantial problems maintaining effective social interaction on a consistent and independent basis with supervisors, coworkers, and the public.  (*Id.*)  Finally, Dr. Tilley opined that Plaintiff's "depression would likely hinder his ability to deal with normal pressures in a competitive work setting . . ." and that Plaintiff "would

find it exceedingly difficult to cope with pressures at this time, given his proclivity for major depression.  He is intellectually disabled and appears to have limited coping skills." (*Id.*)

**D.      School Records**

School records indicate that Plaintiff was referred for an evaluation on March 14, 1991, while he was in third grade, to determine if might qualify for a learning disability program.  (R. at 240.)  He received the following scores on the WISC-R: 79 for verbal scale IQ; 80 for performance scale IQ; and 78 for full scale IQ.  (*Id.*)  A document that is largely illegible but appears to be dated May 10, 1991, also appears to indicate that a specific learning disability was not established for Plaintiff.  (R. at 239.)

**E.      State Agency Reviewers**

Plaintiff's file was reviewed at the initial level on April 1, 2016, by Cynthia Waggoner, Psy. D.  (R. at 626–27.)  Dr. Waggoner indicated that the file contained new evidence since ALJ Faust's July 5, 2013, determination denying Plaintiff's second application for benefits.  (R. at 627.)  But Dr. Waggoner concluded that the new evidence was not material, and thus, she adopted the RFC in ALJ Faust's July 5, 2013, determination.  (*Id.*)  The RFC in that determination included the following mental health limitations: Plaintiff could only perform routine and repetitive tasks and he could not do tasks that required more than occasional interactions with the public.  (R. at 627, 40.)

Plaintiff's file was reviewed at the reconsideration level on June 1, 2016, by Thomas Ruf, Ph.D.  (R. at 644–47.)  Dr. Ruf noted that Plaintiff had sought judicial review of ALJ Faust's July 5, 2013, determination and that the federal action was still pending in this Court.  (R. at 647.)  Accordingly, Dr. Ruf did not adopt the RFC in ALJ Faust's July 5, 2013, determination. (*Id.*)  Instead, Dr. Ruf opined that Plaintiff retained the ability to understand and remember 1–2

step instructions (preferably presented orally and in writing) to compete 1–2 step tasks. (R. at 645.) Dr. Ruf also opined that Plaintiff required:

> 1–2 step instructions to complete 1–2 step short-cycle tasks. He also requires work conditions in which he has only brief and superficial contact with coworkers, due to his reported tendency to become angry around other people. [Plaintiff] retains the capacity to perform work which is not fast-paced and does not have strict production quotas. [Plaintiff] requires infrequent flexibility regarding breaks if and when his symptoms increase at work.

(R. at 646.) Dr. Ruf further opined that due to Plaintiff's reports of irritability around others, he required "work duties in which he has only brief and superficial contact with members of the public, coworkers and supervisors. Also, he should have positive feedback from supervisors when merited and constructive feedback when necessary." (*Id.*) In addition, Dr. Ruf opined that Plaintiff required "advance notice of significant changes, and changes should be infrequent and implemented gradually. He will also need direction from supervisor in making simple, well-learned decisions and goals." (*Id.*)

## IV. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

11

Although the substantial evidence standard is deferential, it is not trivial. The Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## V.     ANALYSIS

As noted, Plaintiff raises the following contentions of error: (1) ALJ Lesperance erred by finding that Plaintiff had severe mental impairments but failing to include limitations in Plaintiff's RFC that corresponded to all of them; and (2) ALJ Lesperance erred when evaluating medical opinions from the consultative examiners, Drs. Meyers and Tilley. (ECF No. 17, at PageID # 1143–45, 1145–48. The Court finds that both allegations of error lack merit.

### A.     ALJ Lesperance did not err by failing to include limitations that corresponded to every severe mental impairment.

Plaintiff contends that ALJ Lesperance committed reversible error because she determined that Plaintiff's borderline intellectual functioning, depressive disorder, and anti-social personality disorder were all severe impairments, but then she only included in Plaintiff's

12

RFC a limitation that addressed the limiting effects of Plaintiff's borderline intellectual functioning— a limitation to simple and routine tasks.  (*Id.*, at PageID # 1144.)  Stated differently, Plaintiff contends that because ALJ Lesperance found that Plaintiff's depressive and anti-social personality disorders were also severe, she was required to also include limitations for them in Plaintiff's RFC as a matter of law.

That contention is incorrect.  An ALJ does not necessarily err by determining that an impairment is severe but also assessing an RFC that does not contain any limitations related to that severe impairment.  As the Sixth Circuit Court of Appeals has explained:

> The RFC describes "the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from—though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities."  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002)].  "A claimant's severe impairment may or may not affect his or her functional capacity to do work.  One does not necessarily establish the other."  *Yang v. Comm'r of Soc. Sec.*, No. 00–10446–BC, 2004 WL 1765480, at *5 (E.D. Mich. July 14, 2004) . . . .  The regulations recognize that individuals who have the same severe impairment may have different RFCs depending on their other impairments, pain, and other symptoms.  20 C.F.R. § 404.1545(e).

*Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007); *see also McGill v. Comm'r of Soc. Sec.*, No. 2:20-CV-2940, 2021 WL 3087640, at *4 (S.D. Ohio July 22, 2021), (explaining that "it is not necessarily inconsistent to recognize plantar fasciitis as a severe impairment and to articulate an RFC that does not contain any plantar fasciitis-related limitations"), *report and recommendation adopted*, 2021 WL 3487991 (S.D. Ohio Aug. 9, 2021); *Wright v. Comm'r of Soc. Sec.*, No. 2:16-cv-297, 2017 WL 4339670, at *2 (S.D. Ohio Sept. 29, 2017) (explaining that "the mere fact that the ALJ's RFC determination did not contain migraine-related limitations does not make the RFC inconsistent with the ALJ's finding at step two that the Plaintiff's headaches amounted to a severe impairment."); *Simpson v. Comm'r of Soc. Sec.*, No. 1:13-cv-640, 2014 WL 3845951, at *9 (S.D. Ohio Aug. 5, 2014) (explaining that

13

"an individual can have a severe impairment, *i.e.*, one that more than minimally affects work ability, and still retain the RFC to do a wide variety of work. Put another way, the existence of a severe impairment says nothing as to its limiting effects."); *Zorn v. Comm'r of Soc. Sec.,* No. 12-13822, 2015 WL 5545257, at *3 (E.D. Mich. Sept. 18, 2015) (explaining that "it is not necessary for every single severe impairment to be reflected in the RFC in every single claim . . . . [A]n RFC may in some cases not reflect every single severe impairment if that impairment has no effect on a claimant's functional capacity."). For this reason, Plaintiff's contention that ALJ Lesperance was automatically required to include limitations that corresponded to all of Plaintiff's severe mental impairments lacks merit.

In support of this contention, Plaintiff asserts that severe impairments are defined as conditions that limit a claimant's capacity to carry out basic work activities, and thus, by definition, severe impairment necessarily impose functional limitations on Plaintiff's ability to work. (ECF No. 17, at PageID # 1145–46 (citing 20 C.F.R. § 404.1520(c)).) But the finding of a "severe" impairment at step two does not carry the same meaning as it otherwise would in ordinary parlance. *See Griffeth,* 217 F. App'x at 428. As defined by the Social Security regulations, a "severe" impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." § 404.1520(c). Courts, however, liberally construe the phrase "significantly limits" in favor of claimants. *Griffeth,* 217 F. App'x at 428. If the Commissioner rates the degree of limitation as none or mild, then the Commissioner will generally conclude that the impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d). But "more than minimal" is a light burden because step two is designed to be the means by which the

14

Commissioner can screen out totally groundless claims. *Farris v. Sec'y of Health & Human Servs.,* 773 F.2d 85, 89 (6th Cir. 1985). For that reason, a finding that a claimant has no severe impairments ends the disability inquiry. But a finding that a claimant has at least one severe impairment does not mean that a claimant has limitations. Instead, it means that the ALJ must proceed with the five-step sequential evaluation process.

If the five-step inquiry proceeds, an ALJ must consider the impacts of all impairments, severe and not, when assessing an RFC. In this case, ALJ Lesperance explicitly considered all of Plaintiff's severe mental impairments when assessing Plaintiff's RFC—including Plaintiff's depressive and anti-social personality disorders—and determined that they did not warrant any specific limitations beyond a limitation to simple, routine tasks. (R. at 493.) ALJ Lesperance wrote:

> Regarding the claimant's mental impairments, although he has mental health diagnoses as noted above, his treating source notes do not offer any signs or findings of depression. And these notes also do not indicate any difficulty interacting with his treating physicians. There were also no signs of any mental health problems at the internal medicine consultative examination or at the hearing. At the psychological consultative examination his attention was adequate, but concentration seemed limited at times. Yet more recently, at the emergency room and the spine clinic, there was no indication of any impairment mentally. The claimant does have a limited education noted by him at times being sixth grade but other times being the ninth grade. Dr. Tilley stated that the claimant appeared to be functioning in the intellectually disabled range of intelligence. However, as previously explained, school records show that the lowest of the claimant's IQs was 78, i.e. borderline intellectual functioning. Therefore, based on the lack of overt findings regarding the claimant's depression and anti-social personality disorder as well as his borderline intellectual functioning, the claimant's limitation to simple, routine tasks is reasonable. And as the claimant has been able to relate to various sources, he would be able to relate to co-workers, supervisors, and the public with little difficulty.

(R. at 493.)

As the discussion above makes clear, ALJ Lesperance concluded that Plaintiff's severe impairment of depressive disorder did not warrant additional restrictions because even though

15

Plaintiff was diagnosed with depression, notes from his treating sources did not show that he had signs or findings of depression.  (*Id.*)  The record substantially supports that conclusion—Dr. Philips' examinations routinely found that Plaintiff had no evidence of depression.  (*See* R. at 444, 439, 436, 432, 429, 426, 467, 470, 913, 16, 20, 944, 946, 949, 953, 958, 961.)  In addition, Dr. Phillips regularly wrote that Plaintiff's affective psychosis was improved or stable with medication.  (*See* R. at 470, 914, 25.)

ALJ Lesperance also concluded that although Plaintiff was diagnosed with anti-social personality disorder, additional limitations were not warranted because the record did not reflect that Plaintiff had difficulty interacting with others.  (R. at 493.)  The record substantially supports that conclusion too— the records is bereft of evidence that Plaintiff had difficulties interacting with his treatment providers.  Indeed, treatment records reflect that Plaintiff had "normal interpersonal interactions and appropriate . . . demeanor" (R. at 396), and that his affect was appropriate or normal (*id.*, R. at 344, 1020).  Moreover, consultative examiner Dr. Tilley wrote that Plaintiff was "appropriately behaved and interpersonally appropriate" during his evaluation, and he opined that Plaintiff would not have substantial problems maintaining effective social interaction on a consistent and independent basis with supervisors, coworkers, and the public.  (R. at 985.)

For all these reasons, the undersigned concludes that ALJ Lesperance did not err by finding that Plaintiff had no depression or anti-social personality-related limitations even though she found that those disorders were severe at step two.  Accordingly, Plaintiff's first allegation of error is not well taken.

**B.** **ALJ Lesperance did not err when evaluating medical opinions from consultative examiners Drs. Meyer and Tilley.**

Plaintiff contends that ALJ Lesperance erred when evaluating medical opinions from Drs. Meyer and Tilley. (ECF No. 17, at PageID # 1145–48.) The Court finds otherwise.

An ALJ must evaluate all medical opinions that are received in a claimant's case. 20 C.F.R. § 416.927(c).[5] When weighing a consultative examiner's opinion, an ALJ must evaluate the factors listed in 20 C.F.R. § 416.927(c)(2)–(6). Those regulatory factors are the: (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinion with the record as a whole; (5) specialization of the treating source; and (6) other factors. § 416.927(c)(2) –(6). Consultative examiners' opinions are not entitled, however, to any particular deference and an ALJ need not give "an exhaustive factor-by-factor analysis" of them. *Kent v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 643, 650 (S.D. Ohio 2015) (quoting *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011)). Because consultative examiners usually meet with a claimant only once, they do not have an on-going treatment relationship with a claimant that would trigger the deference owed to treating physicians. *Andres v. Comm'r of Soc. Sec.*, 733 F. App'x 241, 245–46 (6th Cir. 2018) (the absence of an on-going treatment relationship means "the ALJ is entitled to give less weight to the consultative examiner's opinion") (citing *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 467 (2017)).

**1.** **ALJ Lesperance did not err when evaluating Dr. Meyer's opined social and low stress limitations.**

In this case, ALJ Lesperance gave great weight to Dr. Meyer's opinion that Plaintiff was able to perform simple, routine, tasks because they were generally consistent with the record.

---

[5] Because Plaintiff's second and third applications were filed in March 2012 and January 2016, they are governed by regulations applicable to claims filed before March 27, 2017.

(R. at 496.)  But ALJ Lesperance assigned little weight to Dr. Myer's opined social and low stress limitations.  (R. at 496.)  ALJ Lesperance wrote:

> Dr. Meyer's consultative psychological opinion appears to be generally supported by the record, including the prior ALJ's findings . . . .  I give great weight to the claimant's ability to perform simple, routine tasks and that he has adequate concentration, persistence and pace to perform simple, routine tasks without requiring further pace limits.  Dr. Meyer suggests that the claimant should have social limits, but treating sources only show some irritability at times, generally noting him to be pleasant and cooperative with examiners.  He also interacted normally at both hearings.  There is no evidence of any legal involvement, and he was a lead worker in the past with success on the job, showing a past ability to relate normally without any evidence of declining or worsening mental health symptoms.  Therefore I give little weight to the social limitations offered by Dr. Meyer.  She suggests a low stress setting but does not define that term and, given the record as a whole I conclude that limiting the claimant to simple, routine tasks is adequate to accommodate any deficits.  This is based on his demonstrated ability to work in fast food in the past, his relatively benign treating notes, lack of evidence of worsening condition, and lack of effort to obtain ongoing treatment once he lost his primary care physician.

(*Id.*)  Plaintiff does not challenge ALJ Lesperance's evaluation of Dr. Myer's simple, routine, task opinion.  Instead, he challenges ALJ Lesperance's assignment of little weight to the social and low stress limitations opined by Dr. Myer.[6]

> ### a. ALJ Lesperance did not err when assigning little weight to Dr. Myer's opined social limitations.

As the discussion above demonstrates, ALJ Lesperance concluded that Dr. Myer's opined social limitations were entitled to little weight for several reasons.  ALJ Lesperance explained that treatment notes generally reflected that Plaintiff was pleasant and cooperative.  (*Id.*)  Substantial weight supports that reason— treatment records reflect that Plaintiff had "normal interpersonal interactions and appropriate . . . demeanor" (R. at 396), and that his affect was appropriate or normal (*id.*, R. at 344, 1020).

---

[6] ALJ Lesperance also gave no weight to the GAF score that Dr. Meyer assessed for Plaintiff. (R. at 496.)  Plaintiff does not challenge ALJ Lesperance's evaluation of that GAF score.

ALJ Lesperance also explained that Dr. Myer's opined social interaction limitations were entitled to little weight because Plaintiff interacted normally at the hearing.  (R. at 496.) Substantial evidence also supports that reason.  It was within ALJ Lesperance's purview to take note of Plaintiff's demeanor at the hearing.  *See Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2017) (citing *Ashworth v. Sullivan*, 951 F.2d 348 (6th Cir. 1991) (Table)) ("noting that claimant's demeanor at the hearing belied her doctor's conclusions of disability.") Moreover, a review of the hearing transcripts demonstrates that Plaintiff had no difficulty interacting at those proceedings.  (R. at 512–44, 545–65.)  Indeed, Plaintiff testified that he lived with his children's mother.  (R. at 518–19.)  And although he elsewhere described his romantic relationship as "so-so" he also indicated that he had been in that relationship for 11 years.  (R. at 416.)  Plaintiff further testified that he socialized with friends every six-months-to-a-year and that he had recently stayed at a friend's house.  (R. at 532).

In addition, ALJ Lesperance explained that Dr.Myer's opined social interaction limitations were entitled to little weight because Plaintiff had been a "lead worker" in the past without any evidence of declining or worsening mental health conditions.  (R. at 496.) Substantial evidence supports that reason as well.  Plaintiff testified that he had been a cashier and a bagger at a fast-food restaurant where he was required to talk to customers.  (R. at 525.) When asked why he was no longer able to perform his past work, Plaintiff did not indicate that it was due to problems he had interacting with others and instead cited his hip pain and lack of education.  (R. at 525–26.)  Plaintiff also reported to Dr. Tilley that his relationships with co-workers were good when he was working.  (R. at 981.)  Likewise, there was no evidence that Plaintiff's condition had declined since he last worked—Plaintiff testified that his mental health

was about the same even after he stopped receiving mental health treatment and medications. (R. at 532.)

Other evidence supports ALJ Lesperance's decision to discount the weight assigned to Dr. Myer's opined social limitations. First, Dr. Myer's noted that Plaintiff's "ability to relate to others [was] negatively impacted by subjectively reported verbal anger outbursts." (R. at 424.) When rating the reliability of her examination findings, however, Dr. Myer indicated that "self-report information should be used and interpreted somewhat cautiously." (R. at 421.) Thus, Dr. Myer's report suggests that Plaintiff's subjective reports about his verbal anger outbursts were not entirely reliable. In addition, Dr. Tilley found that Plaintiff was "appropriately behaved and interpersonally appropriate" during his evaluation and he opined that Plaintiff would not have substantial problems maintaining effective social interaction on a consistent and independent basis with supervisors, coworkers, and the public. (R. at 985.)

Accordingly, the undersigned concludes that ALJ Lesperance did not commit reversible error when assigning little weight to social limitations opined by Dr. Myer.

### b. ALJ Lesperance did not err when assigning little weight to Dr. Myer's opined low stress limitations.

As the discussion above also demonstrates, ALJ Lesperance also concluded that Dr. Myer's opined low stress limitations were entitled to little weight for four reasons: (1) Plaintiff's ability to work in fast food in the past; (2) Plaintiff's relatively benign treatment notes; (3) a lack of evidence of worsening; and, (4) Plaintiff's lack of effort to obtain ongoing treatment after Dr. Phillips stopped treating him. (R. at 496.) Substantial evidence supports these reasons. As noted, Plaintiff testified that he had been a cashier and a bagger at a fast-food restaurant where he was required to talk to customers (R. at 525), and he reported to Dr. Tilley that his relationships with co-workers had been good when he was working (R. at 981). Notes from Plaintiff's

examinations also reflected relatively benign mental health finding. Dr. Philips routinely found that Plaintiff had no evidence of unusual anxiety or depression (R. at 444, 439, 436, 432, 429, 426, 467, 470, 913, 16, 20, 944, 946, 949, 953, 958, 961) and that Plaintiff's affective psychosis was improved or stable with medication (R. at 470, 914, 25). The record also fails to demonstrate that Plaintiff's condition had worsened since he last worked. Last, the record reflects that Plaintiff did not seek mental health treatment after Dr. Phillips stopped treating him—the record reflects that Plaintiff last treated with Dr. Phillips in 2015 (R. at 960), and that he had not sought mental health treatment after that.

Accordingly, the undersigned concludes that ALJ Lesperance did not commit reversible error when assigning little weight to the low stress limitation opined by Dr.Myer.

### 2. ALJ Lesperance did not err when evaluating Dr. Tilley's opinions.

Plaintiff also challenges ALJ Lesperance's evaluation of Dr. Tilley's opinions. ALJ Lesperance gave significant weight to Dr. Tilley's opinion that Plaintiff was able to understand and carry out simple routine tasks, the hazards limitations that Dr. Tilley opined, and Dr. Tilley's opinion that Plaintiff had no social limitations. (R. at 497.) But ALJ Lesperance declined to adopt Dr. Tilley's other opined limitations. (*Id*.) ALJ Lesperance wrote:

> I also give partial weight to the opinion of Dr. Tilley, the more recent consultative psychological examiner . . . . I give significant weight to the claimant's ability to understand, remember, and carry out simple, routine tasks and have adopted the hazard limitation as offered. I have additionally adopted no social limitations, as suggested in this examination and better supported than the earlier psychological consultative examination. However, I do not adopt the conclusions that the claimant has substantial problems with concentration, persistence, or pace or would find it "exceedingly difficult" to cope with pressures as the record does not support these restrictions. The record shows that the claimant is consistently noted to have no unusual psychological symptoms at his primary care appointments and with emergency room treatment. He is pleasant and appropriate with treating providers. And although he initially denied socializing, he then admitted smoking marijuana with friends, at least intermittently.

21

(R. at 497.)

As demonstrated in this excerpt, ALJ Lesperance gave no weight to Dr. Tilley's additional opinions and gave several reasons for doing so.  First, she explained that she did not adopt these additional limitations because Plaintiff's treatment records consistently demonstrated that Plaintiff had no unusual symptoms.  (R. at 497.)  Substantial evidence supports that reason.  Dr. Tilley indicated that Plaintiff's problems with concentration, persistence, and pace would be compounded by his depression and that coping with work pressures would be made difficult by Plaintiff's proclivity for depression.  (R. at 985.)  But Dr. Phillips routinely found that Plaintiff had no evidence of unusual anxiety or depression (*see* R. at 444, 439, 436, 432, 429, 426, 467, 470, 913, 16, 20, 944, 946, 949, 953, 958, 961) and that Plaintiff's affective psychosis was improved or stable with medication (*see* R. at 470, 914, 25).  In addition, and as ALJ Lesperance also indicated, examinations during ER visits revealed no unusual psychological findings.  (R. at 497.)  Plaintiff had a normal psychiatric evaluation during an ER examination on January 24, 2012.  (R. at 396.)  Plaintiff was also alert and oriented to person, place, and time during an ER visit on November 12, 2016.  (R. at 990.)

ALJ Lesperance also declined to adopt Dr. Tilley's additional limitations because Plaintiff was pleasant and appropriate with treating providers.  (R. at 497.)  Substantial evidence supports that reason.  The record reflects that treatment providers found that Plaintiff had normal interpersonal interactions and appropriate demeanor and affect.  (*See* R. at 396, 341.)

ALJ Lesperance also declined to adopt Dr. Tilley's additional limitations because Plaintiff denied socializing but then admitted to occasionally smoking marijuana with friends.  (R. at 497.)  Substantial evidence supports that reason.  Plaintiff reported to Dr. Meyer that he smoked marijuana starting at age 13, and that he smoked approximately one blunt a day.  (R. at

22

416.)  At the hearing on February 9, 2017, Plaintiff acknowledged smoking marijuana socially with a friend.  (R. at 532.)   Dr. Meyer indicated in her assessment that Plaintiff's difficulty in responding to work pressure in a work setting might be related to Plaintiff's cannabis use.  (R. at 424.)  ALJ Lesperance's determination that Plaintiff's marijuana use undermined Dr. Tilley's opinion that Plaintiff would have difficulty coping with work pressures because of his depression was thus supported by substantial evidence.

In sum, the Court concludes that ALJ Lesperance offered a thorough, detailed discussion of the record evidence, discussed the consultative examiners' opinions, and provided reasons for either crediting or discounting them.  Those reasons enjoyed substantial record support.  Therefore, the Court finds that ALJ Lesperance did not err when evaluating the consultative examiners' opinions and that Plaintiff's second allegation of error lack merit.

## VI.    CONCLUSION

For all the foregoing reasons, the Court finds that Plaintiff's allegations of error are not well taken.  Accordingly, Plaintiff's Statement of Errors is **OVERRULED**, and the Commissioner's non-disability determination is **AFFIRMED**.

**IT IS SO ORDERED.**

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE